## UNITED STATES ex rel. VAJTAUER v. COMMISSIONER OF IMMIGRATION.

APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF NEW YORK.

No. 111. Argued November 24, 29, 1926.—Decided January 3, 1927.

1. Want of due process in proceedings for the deportation of an alien is not established by showing merely that the decision was erroneous or that incompetent evidence was received and considered. P. 106.

2. Insofar as concerns proofs, an order of deportation is upheld, in *habeas corpus,* if there was some evidence to support it and no error so flagrant as to convince a court of the essential unfairness of the trial. P. 106.

3. Statements of an alien tending to show that he belonged to an excluded class at time of entry may be used in deportation proceedings, whether made before or after his admission. P. 110.

4. Evidence of identity of an alien with the author of seditious pamphlets and speeches may be found in a similarity of names, appellations, nativity, etc. P. 111.

5. The silence of the alien without sufficient explanation, when called upon to testify, may be persuasive evidence against him, even as to incriminating matters, when they are not privileged. P. 111.

6. The privilege against self-incrimination may be waived if not timely asserted. P. 113.

15 Fed. (2d) 127, affirmed.

APPEAL from a judgment of the District Court dismissing a writ of *habeas corpus.*

*Mr. Walter H. Pollak,* with whom *Messrs Isaac Shorr* and *Carol Weiss King* were on the brief, for the appellant.

*Solicitor General Mitchell* for the appellee.

MR. JUSTCE STONE delivered the opinion of the Court.

Vajtauer, appellant, was arrested in deportation proceedings on a warrant issued April 4, 1924, by the Assistant Secretary of Labor, charging that Vajtauer, an alien, had entered the United States, December 1, 1923, in violation of the Act of October 16, 1918, c. 186, 40 Stat. 1012, as amended by the Act of June 5, 1920, c. 251, 41 Stat. 1008, printed so far as relevant in the margin.[1]

---

[1] The following classes are excluded from admission:

"(a) Aliens who are anarchists;

"(b) Aliens who advise, advocate, or teach, or who are members of or affiliated with any organization, association, society, or group, that advises, advocates, or teaches, opposition to all organized government;

"(c) Aliens who believe in, advise, advocate, or teach, or who are members of or affiliated with any organization, association, society or group, that believes in, advises, advocates, or teaches: (1) the overthrow by force or violence of the Government of the United States or of all forms of law, . . .

The particular violations of the statute alleged were that prior to or at the time of his entry, appellant (1) believed in and advocated the overthrow of the government of the United States or all forms of law; (2) wrote, published, circulated or had in his possession for circulation written or printed matter advocating opposition to all organized government; (3) wrote, published, circulated or had in his possession for circulation written or printed matter advocating the overthrow by force or violence of the government of the United States or of all forms of law.

After a hearing before an immigration inspector, and a review of all the proceedings by the Board of Review, the Secretary of Labor, upon the recommendation of that board, ordered deportation. While in the custody of the Commissioner of Immigration at the Port of New York, the alien assailed the legality of his detention in a petition for a writ of *habeas corpus* which was issued by the District Court for southern New York. Upon the return of the writ and after a hearing, that court dismissed the writ, remanded appellant to the custody of the Commissioner and stayed deportation pending an appeal. 15 Fed. (2d) 127. The case comes here on direct appeal, on the ground that appellant was denied rights guaranteed by the Fifth Amendment of the federal Constitution. § 238 Jud. Code, prior to the amendment of February 13, 1925.

---

"(d) Aliens who write, publish, or cause to be written or published, or who knowingly circulate, distribute, print, or display, or knowingly cause to be circulated, distributed, printed, published, or displayed, or who knowingly have in their possession for the purpose of circulation, distribution, publication, or display, any written or printed matter, advising, advocating, or teaching, opposition to all organized government, or advising advocating or teaching: (1) the overthrow by force or violence of the Government of the United States or of all forms of law, . . ."

Section 2 provides for the deportation of those who at any time after entering this country are found to have been at the time of entry members of the excluded class.

The constitutional questions assigned are (1) that the deportation order was unsupported by any substantial evidence and consequently appellant was denied a fair hearing and deprived of his liberty without due process; (2) that the action of the immigration authorities in drawing certain inferences from his refusal to answer questions asked, deprived him of the protection against self incrimination accorded by the Fifth Amendment.

Deportation without a fair hearing or on charges unsupported by any evidence is a denial of due process which may be corrected on *habeas corpus*. Cf. *Chin Yow* v. *United States,* 208 U. S. 8; *Kwock Jan Fat* v. *White,* 253 U. S. 454. But a want of due process is not established by showing merely that the decision is erroneous, *Chin Yow* v. *United States, supra,* 13, or that incompetent evidence was received and considered. See *Tisi* v. *Tod,* 264 U. S. 131, 133. Upon a collateral review in *habeas corpus* proceedings, it is sufficient that there was some evidence from which the conclusion of the administrative tribunal could be deduced and that it committed no error so flagrant as to convince a court of the essential unfairness of the trial. *Tisi* v. *Tod, supra.*

The ultimate question presented by this record, therefore, is whether the warrant of deportation was supported by any evidence that the alien when he entered the United States advocated opposition to all organized government or the overthrow of the United States government by force and violence, within the meaning of the statute. This requires a review of the evidence.

At the hearing before the immigration authorities on May 14, 1924, appellant, who was represented by counsel, was sworn as a witness, gave his name as Emanuel Vajtauer and his occupation as " Doctor of Psychology," and editor of the " Spravedlvost," a Bohemian newspaper published in Chicago. He testified that he resided in Illinois; that he entered the United States on Decem-

ber 1, 1923; and that he was a citizen of Czechoslovakia by birth. After answering other preliminary questions, he was then asked: "Why did you come to the United States?" Appellant's attorney then stated: "I will advise the alien not to answer any further questions until the evidence upon which the warrant is based will be presented here."[2] Appellant then stated that he would follow his attorney's advice, and gave no further testimony. The Immigration Inspector introduced in evidence a pamphlet, stated by him to bear the name of Dr. E. M. Vajtauer as author. An interpreter testified that it was Dr. Vajtauer's study of the Russian Revolution. The title, as printed in the record, was "Revolution and the Dictatorship of the Proletariat, by Dr. E. *Da*jtauer, written in Moscow in the Spring of 1920." Translations of certain passages from the pamphlet by the interpreter were spread upon the record. Some of these excerpts merely gave an account of the Russian Revolution and the revolutionists' own justification for their overthrow of the Russian government. Others, printed in the margin, purported on their face to advocate the overthrow of government by revolution or force.[3]

---

[2] It was argued here that the objection took this form because counsel at the hearing labored under the misapprehension that the former rules which entitled an alien at the beginning of the hearing to inspect the warrant of arrest and all the evidence on which it was issued, were still in force. These rules had been changed before the first hearing of May 14, 1924. Even if counsel was unaware of the changes at that time, the hearing was not resumed until August 27, 1924, when the government's case was closed. Counsel declined an invitation to have the alien testify in his own behalf or to permit his examination although all the evidence on which the warrant was based had been presented. No reason for his not testifying was given.

[3] "Only when you kill the bourgeois-capitalist, only then you will be free. By this kind of primitive logic it is usually necessary to lead the revolting soldier, in order that he should not unnecessarily sacrifice himself and others.

*            *            *            *            *

The Inspector also placed in evidence a newspaper published by the Slovak Labor Socialist Federation of America, containing a report of a speech stated in the record to have been made by a Dr. Vajtauer, the editor of the Bohemian daily, " Spravedlvost." In this address the causes and effects of the world war and of the revolutionary movements in Europe were described from the

---

" During the attack, the revolution must be merciless. It must destroy the old system, not leaving even a single stone unturned.

　　*　　　　*　　　　*　　　　*　　　　*

" The people, who suffered too long, will knock to the ground the socialist traitors and bourgeois, and will punish with death any attempt of resistance. They have a right to do that! Others have killed millions of their brothers previously. The lowest, the most suffering class of people has seized the rule into its own hands. It took away every chance of the murderers for further oppression and crime. It dictates quietly to the farmer vampires. It carries on the dictatorship of the proletariat!

" This is the first problem of the proletarian dictatorship, and that is to capture the murderers and traitors of the people, the imperialists, militarists, capitalists, bourgeoisie and social-democrats and prevent them from committing any further crimes.

　　*　　　　*　　　　*　　　　*　　　　*

" Should the Bohemian worker have as much courage as the Russian worker has, he would see quickly the necessity of seizing the rule of factory into his own hands and expell the owner of the factory who has no right to own the property of the factory. The plant, which is to supply the needs of the people, belongs to the people, and must be run only by the people, only by the working people. The means of production are not a private property, they are the people's property. Private property is only a masked loot of people's property. The government, which recognizes private property, is the government which recognizes the looting the people, and how the robbers are treated? They are treated so that they are not given chance to loot. The robber should be locked up, irons should be put on his wrists, and guard placed to watch him. . . .

　　*　　　　*　　　　*　　　　*　　　　*

" Revolution is a sudden expansion of the people which suddenly abolishes the injustice piled for centuries. The proletarian dictatorship is an armed guard of liberties gained by revolution."

viewpoint of the proletariat. The speaker predicted a much fiercer revolutionary struggle in this country than that which took place in Europe and the concluding paragraphs, printed in the margin,[4] suggest at least that the speaker advocated such a revolution. Other documentary evidence received consisted of an abridged report of the "Fourth Congress of the Communist International, Meetings held at Petrograd and Moscow, November 7 and December 3, 1922," containing a statement purported to have been made by a Dr. Vajtauer, Czechoslovakia, on Czechoslovakian affairs.

---

[4] "Pointing out the proletariat of America, the speaker said, that when the time comes when the American proletariat, which have tasted a bit of the capitalistic luxuries, will find itself deprived of these luxuries, then the American proletariat will be much more revolutionary than that of Europe, it is hard to preach revolution to the full stomach, but once this stomach is empty it revolts, and seeks the means to obtain the supplies. The speaker pictured the American proletariat as a mole, which got hold of a bone thrown from the capitalistic table, to satisfy the hunger of this mole. He predicted much fiercer revolutionary struggle in this country than that which took place in Europe, much more blood will be shed in this country than was shed in Europe.

"Toward the end of his speech, the speaker predicted that the next large war will be between the European countries and America, because America being a creditor, would in due time demand the payment of debt from debtors, and these being poor, would try to repudiate the American debt, this naturally would lead to war, and it would be up to the proletariat to stop the war of this kind, because the proletariat once more would be asked to supply the army. The speaker pointed out the Communistic government of Russia as an example for the proletariat of the other countries of the world, further he said, that there is a probability of another great war and this war may be the war between the United States Proletariat countries of Europe, against the capitalistic America, and then the proletariat of America would find itself in the position either to fight the proletariat of Europe, or else fight against its own capitalists, and it is up to the conscientious leaders of the proletariat to prepare the workers for this fatal moment."

Under instructions of his attorney, appellant refused to answer further questions calculated to establish his identity with the author of the pamphlet and with the Dr. Vajtauer who made the address reported in the newspaper article and the Dr. Vajtauer who addressed the Congress of the Communist International.

A point much argued before us was whether § 23 of the Immigration Law of May 26, 1924, c. 190, 43 Stat. 165, which took effect before the hearing was closed, placed on appellant the burden of proving that he was not a member of a class of aliens excluded from entering the United States by the Immigration laws. Section 23 provides in part: "and in any deportation proceeding against any alien the burden of proof shall be upon such alien to show that he entered the United States lawfully." It was plausibly urged that the language of the statute as well as its legislative history indicates that this clause relates only to the proof of the regularity of the alien's entry with respect to time, place, manner and the like, and not to his membership in an excluded class. But we find it unnecessary to consider this question, as we think that the record taken as a whole and without the aid of any statutory presumption presents some evidence supporting the deportation order.

We disregard the Moscow address as having no substantial bearing on appellant's membership in an excluded class. But the extracts from the pamphlet and the report of the Chicago speech, taken together, are at least some evidence tending to show that the author of them advised and advocated opposition to all organized government and the overthrow of the United States government by violence, and therefore could, as an alien, be excluded from admission into the United States by the provisions of § 1 of the Act of June 5, 1920, supra, or if admitted, deported if found to have been a member of an excluded class at the time of entry (§ 2). Statements made before or after

entry may be taken to indicate that he was subject to exclusion at the time of entry.

The only other issue on which the government was required to present evidence, assuming that the burden of proof rested on it, was the identity of the appellant, admittedly an alien, with the author of the pamphlet and the address. The similarity of names; the fact that each was known as " Doctor "; that a Dr. Vajtauer, also of Czechoslovakia, as was appellant, addressed the Fourth Congress of the Communist International on Czechoslovakian affairs in Moscow where the pamphlet was written, and that after the arrival of appellant in the United States and his proceeding to Chicago, a Dr. Vajtauer, who was editor of the Bohemian daily paper, " Spravedlvost," as was appellant, made a public address in Chicago, discussing the Russian revolution and suggesting the possibilities of a similar revolution here, all taken together admit of the inference that the appellant and the author of the pamphlet and speech were one and the same person. This inference was strengthened when the appellant, confronted by this record, stood mute.

" Conduct which forms a basis for inference is evidence. Silence is often evidence of the most persuasive character." *Bilokumsky* v. *Tod,* 263 U. S. 149, 153–4. Appellant as a witness was called upon to testify whether he was the author of the pamphlet and the Chicago speech, facts within his knowledge. If the author, he was in a position to challenge or explain away if possible any unfavorable inference which might be drawn from the passages read into the record. His silence without explanation other than that he would not testify until the entire evidence was presented, was in itself evidence that he was the author. In addition, it fortified the inferences drawn from the pamphlet and speech by the immigration authorities.

Attention is directed to the fact that the refusal to testify was based upon a supposed right of the witness

not to be called upon to testify until all the evidence in support of the warrant was presented, and it is said that if silence is induced by a person's " doubts of his rights or by a belief that his security will be best promoted by his silence; then no inference of assent can be drawn from that silence." Citing *Comm.* v. *Kenny,* 12 Metc. 235, 237; *People* v. *Pfanschmidt,* 262 Ill. 411, 449. But these cases merely apply the rule that no inference may be drawn from silence where there is no duty to speak, a rule which is not applicable where the witness is sworn and under a legal duty to give testimony which is not privileged. Undoubtedly, inferences from silence should be cautiously drawn, *Bilokumsky* v. *Tod, supra,* but the weight to be given to silence is for the tribunal conducting the trial.

It is said also that the evidentiary effect of silence was limited by the decision in *Bilokumsky* v. *Tod, supra,* to a refusal to testify as to non-incriminating facts only. Although the inference from silence in that case pertained to non-incriminating facts, there was no intimation there that inferences could not be drawn from a failure to testify to incriminating matters which are not privileged. Here as in that case the objection to drawing the inference can have force only insofar as there was a denial of the constitutional immunity.

It is insisted that answers to the questions put to appellant at the hearings which were held in Chicago might have tended to incriminate him under the Illinois Syndicalism Law, Ill. R. S. 1925, c. 38, §§ 587–593, which condemns as a felony the advocacy or publication of matter advising crime or violence or other unlawful means of accomplishing the reformation or overthrow of the government. Assuming that the constitutional immunity against self-incrimination may be violated as well by inferences drawn from silence with respect to incriminating matters as by testimony which the witness is compelled to give, still it is necessary to inquire whether the

appellant here has brought himself within the protection of the immunity.

Throughout the proceedings before the immigration authorities, he did not assert his privilege or in any manner suggest that he withheld his testimony because there was any ground for fear of self-incrimination. His assertion of it here is evidently an afterthought. It is for the tribunal conducting the trial to determine what weight should be given to the contention of the witness that the answer sought will incriminate him, *Mason* v. *United States*, 244 U. S. 362, a determination which it cannot make if not advised of the contention. Cf. *In re Edward Hess & Co.*, 136 Fed. 988; *Ex parte Irvine*, 74 Fed. 954, 960. The privilege may not be relied on and must be deemed waived if not in some manner fairly brought to the attention of the tribunal which must pass upon it. See *In re Knickerbocker Steamboat Co.*, 139 Fed. 713; *United States* v. *Skinner*, 218 Fed. 870, 876; *United States* v. *Elton*, 222 Fed. 428, 435. This conclusion makes it unnecessary for us to consider the extent to which the Fifth Amendment guarantees immunity from self-incrimination under state statutes or whether this case is to be controlled by *Hale* v. *Henkel*, 201 U. S. 43; *Brown* v. *Walker*, 161 U. S. 591, 608; compare *United States* v. *Saline Bank*, 1 Pet. 100; *Ballmann* v. *Fagin*, 200 U. S. 186, 195.

*Judgment affirmed.*